UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


THE WHIRLPOOL CORPORATION,

      Plaintiff,

                                    File No.  1:06-CV-634

v.

                                      HON. ROBERT HOLMES BELL

TIMOTHY BURNS,

      Defendant.

_____/

## O P I N I O N

On August 29, 2006, Plaintiff Whirlpool Corporation obtained a temporary restraining order from the Berrien County Circuit Court enjoining Whirlpool's former employee, Defendant Timothy Burns, from beginning employment with Electrolux, and from disclosing any of Whirlpool's trade secrets or other confidential and/or proprietary information.

After Burns removed the case to federal court on the basis of diversity of citizenship, the temporary restraining order was extended to enable the parties to engage in limited discovery prior to the Court's consideration of Whirlpool's motion for preliminary injunction. On September 22, 2006, this Court held an evidentiary hearing on Whirlpool's motion for preliminary injunction.  This opinion contains the Court's findings of fact and conclusions of law regarding that motion.

## I.

Upon graduation from college in 2002, Burns was employed by Maytag Appliance Sales Company in Denver, Colorado, as an appliance salesman.  He began as a district account representative for "big box" stores such as Home Depot, Best Buy, Sears and Lowes in metropolitan Denver.  In January 2005 he became a district manager with customers in a larger area of Colorado.  In March 2006 he became District Manager of Builder Sales in Colorado and New Mexico.  In early 2006 Maytag was acquired by Whirlpool Corp.  In June 2006 Whirlpool offered to retain Burns as an employee in exchange for Burns' signing of a Leadership Agreement.  The Leadership Agreement contains a confidentiality provision[1] and a one-year covenant not to compete.[2]

_____

[1]The confidentiality provision reads as follows:

1.   Timothy A. Burns recognizes that during his/her employment by the Company, he/she will have access to the confidential information of the Company.   Confidential information includes information not publicly available about the Company's research and development, manufacturing methods and formulas, purchasing, marketing, sales, costs, pricing, inventions, improvements, discoveries and ideas (whether patentable or not), financial information and business strategies relating to the Company's business activities.  All information supplied to the company from outside sources not publicly available will be presumed to be confidential unless and until it is designated otherwise.

Leadership Agreement ¶ 1.

[2]The Leadership Agreement's 12-month covenant not to compete provides that:

a.  Timothy A. Burns will not directly or indirectly provide or offer to provide products or services that compete with the Company's products or services to any customer or prospective customer of the Company for which Timothy A.

On August 22, 2006, Burns sent Whirlpool a letter of resignation and informed Whirlpool of his decision to take a job with Electrolux, a direct competitor of Whirlpool in the area of home appliances.  Burns was to be employed by Electrolux as a district manager selling home appliances to independent retailers in Virginia and West Virginia.  The following day Whirlpool representatives came to Burns' home to collect Burns' laptop computer, cell phone, and files on customers and/or builders.

Whirlpool subsequently filed this action alleging breach of contract and violation of trade secrets protections. Through this action Whirlpool seeks an order preliminarily and permanently enjoining Burns from beginning his employment with Electrolux until August 22, 2007, a period of one (1) year from his separation from Whirlpool, and further enjoining him from disclosing trade secrets and other proprietary and confidential information.

---

Burns had direct or indirect responsibilities during the last five years of employment with the Company or;

b. Timothy A. Burns will not directly or indirectly compete with the Company with respect to any product or service for which Timothy A. Burns had responsibility during the last five years of employment with the Company; or

c. Timothy A. Burns will not accept any employment or act in any capacity in competition with the Company in which Timothy A. Burns disclosure or use of the Company's confidential information would facilitate or support the performance of Timothy A. Burns job duties.

Leadership Agreement ¶ 6 (emphasis added).

## II.

The issue currently before this Court is Whirlpool's request for a preliminary injunction prohibiting Burns from beginning employment with Electrolux, or otherwise using the confidential information provided to him by Whirlpool, through and including August 21, 2007, or until a trial on the merits of this action.

In deciding whether to issue a preliminary injunction the Court considers the following four factors:

> (1) whether the plaintiff has established a substantial likelihood or probability of success on the merits; (2) whether there is a threat of irreparable harm to the plaintiff; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by granting injunctive relief.

*Hamad v. Woodcrest Condominium Ass'n*, 328 F.3d 224, 230 (6th Cir. 2003) (quoting *Nightclubs, Inc. v. City of Paducah*, 202 F.3d 884, 888 (6th Cir. 2000). "The four considerations applicable to preliminary injunction decisions are factors to be balanced, not prerequisites that must be met." *Id.* (quoting *Mich. Bell Tel. Co. v. Engler*, 257 F.3d 587, 592 (6th Cir. 2001)). "It frequently is observed that a preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (quoting 11A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 2948, pp. 129-130 (2d ed. 1995) (emphasis added; footnotes omitted)).

4

## III.

Based upon the evidence received at the preliminary injunction hearing, the Court makes the following findings of fact.

Maytag was Burns' first employer after he graduated from college four years ago. Burns is a non-supervisory, entry level salesman.  Burns does not believe he received any confidential information from Whirlpool that is not already part of the public domain.  Burns testified that he received a lot of information from Whirlpool that was not useful to him. After skimming documents for content, he would file them away or delete them if they were not useful.  One of his reasons for leaving Whirlpool was the volume of administrative work that interfered with his ability to sell.  Before leaving Whirlpool Burns interviewed with a pharmaceutical sales company in Wisconsin, but decided not to pursue that opportunity.

Tom Akin, Divisional Director of contract sales for the Mountain States Division of Whirlpool, and Burns' former supervisor, testified that the Whirlpool culture is one of open and trusting communication between management and sales, that it views its sales people as leaders, and that it believes that good knowledge is essential to leadership.  As a result, he testified that strategic and tactical confidential information regarding financial and performance data is communicated to its sales force.  He testified that the confidentiality of the information is preserved by placing a notation on the documents that the information is confidential, privileged and proprietary.

5

As one example of the confidential information shared with Burns, Akin pointed to literature regarding a new product launch, Fabric Care 1-2-3.  The information includes tentative prices, model numbers, specifications, materials, and dates when various colors would be made available.  According to Whirlpool, this was all confidential information.

Akin's testimony was credible.  Nevertheless, the Court finds that the testimony of Bob Frank, the General Manager of the East Region Dealers for Electrolux, was more honest and helpful in recognizing and describing the different kinds of confidential information within a company, the practice of sharing new product information with the sales force on a last minute basis when its disclosure would do the least harm, and the practice of protecting the most confidential information by not broadly disseminating it.

The relevance of Frank's testimony to Whirlpool's practice is borne out by the evidence relating to the Fabric Care 1-2-3 product launch.  The fact that the new product is being launched is public knowledge.  That information is available on the internet.  Although the public information does not contain all of the specific information disclosed to the Whirlpool sales force, disclosure of the specific details at this time cannot cause Whirlpool any realistic harm because the product launch is imminent.  Whirlpool contends that Burns could use knowledge of a new product in his negotiations for floor space with an independent retailer.  However, because the launch of the new product is publicly known, the kind of information that might assist a sales person in obtaining floor space would not be confidential.

Moreover, the kind of confidential information disclosed to the sales force is information designed to enable them to make sales to customers. It is ultimately destined for public consumption. This kind of information does not have the same degree of confidentiality that would attach to information regarding such things as research and development or strategic economic planning.

Some of the information Whirlpool considered confidential was information that had already been distributed to Nationwide, a buying group of independent dealers. This included information relating to the integration of Maytag products into the Whirlpool family of products. According to Frank, this information was common knowledge within the industry. Moreover, trade partners routinely share information obtained from one company to competitors. This sharing of information was demonstrated by the fact that Electrolux had a copy of the power point presentation Whirlpool gave to the Nationwide trade partners.

The evidence revealed that another email document discussing in more detail the integration of Maytag into Whirlpool had been sent to hundreds of people within the Whirlpool organization.

Akin testified that Burns had been present at a conference in San Francisco for a confidential presentation regarding Fergusons, a national buying group. Tom Halford, General Manager of Contract Sales and Marketing for Whirlpool, testified that information regarding the capabilities of Fergusons and Whirlpool's strategies on how to help them grow, could be used by a competitor to hurt Whirlpool. There was no evidence, however, that this

information would be useful to Burns in selling to independent retailers in Virginia and West Virginia.

Halford also expressed concern that a competitor could use documents revealing financial data such as the minimum advertised price and the margin percentage to triangulate the price offered to a particular trade partner or the cost to Whirlpool of producing an item. There was no evidence as to how a competitor's sales force could use this information to the detriment of Whirlpool. Halford's concerns assume that Burns retained the information, and that he would either be involved in high level cost margin calculations for Electrolux, or that he would supply this information to individuals at Electrolux who could use it in that manner. There is no evidence to support such concerns. Again, such information in the hands of some individuals might be harmful, but there is no evidence that this information would be useful to Burns in his employment with Electrolux or that he would be likely to disclose it to others to whom it would be useful.

Whirlpool took Burns' computer and files when he resigned, and advised him to destroy any other Whirlpool documents he had in his possession. Although Burns retained some personnel documents, there is no evidence that he retained any other Whirlpool documents. Whirlpool presented no evidence that Burns has disclosed any confidential Whirlpool information to Electrolux, that he intends to do so, or that he is likely to do so. Burns testified under oath that he was well aware of his obligations under the confidentiality provision.

**IV.**

Whirlpool asserts that Burns' employment with Electrolux will violate the confidentiality and the non-compete provisions of the Leadership Agreement.  Although the Leadership Agreement's non-compete provision covers customers, products, and confidential information, Whirlpool's motion for preliminary injunction only focuses on products and confidential information.[3]

Under the Michigan Antitrust Reform Act, to be enforceable, covenants not to compete must protect an employer's "reasonable competitive business interests" and must be "reasonable as to its duration, geographical area, and the type of employment or line of business."  M.C.L. § 445.774a.  Michigan law commands the courts to narrowly construe restrictive covenants.  *United Rentals (North America), Inc. v. Keizer*, 355 F.3d 399, 408 (6th Cir. 2004).  A covenant not to compete may not be read to extend beyond an employer's "reasonable competitive business interests."  *Kelsey-Hayes Co. v. Maleki*, 765 F. Supp. 402, 406 (E.D. Mich.), *vacated pursuant to settlement*, 889 F. Supp. 1583 (E.D. Mich. 1991).[4]

The reasonableness of a covenant not to compete is not analyzed in the abstract, but in the context of the employer's particular business interest and the function and knowledge

---

[3]Burns' customers for Whirlpool were big box stores and builders in Colorado and New Mexico, while his prospective customers for Electrolux would be independent retailers in Virginia.  There was no evidence to suggest a potential overlap of customers or a violation of ¶ 6(a).

[4]Although *Kelsey-Hayes* has been vacated, its analysis with respect to Michigan law was  relied on by the Sixth Circuit in *United Rentals*, 355 F.3d at 408.

of the particular employee.  *See Kelsey-Hayes*, 765 F. Supp. at 406 (noting that "[i]t is not reasonable to place as stringent a tie on an entry level computer programmer as might be placed upon a system designer," and finding that employer's asserted interest in precluding employment did "not extend to one performing Maleki's function, at his level of comprehension.").

Paragraph 6(c) of the Leadership Agreement prohibits Burns from competing with Whirlpool in any business where his disclosure or use of Whirlpool's confidential information would facilitate or support the performance of his job duties.  Under Michigan law, preventing the anticompetitive use of confidential information is a legitimate business interest." *Ram Products Co., Inc. v. Chauncey*, 967 F. Supp. 1071, 1091 (N.D. Ind. 1997) (applying M.C.L. § 445.774a).  On the other hand, "an employee is entitled to the unrestricted use of general information acquired during the course of his employment or information generally known in the trade or readily ascertainable." *Follmer, Rudzewicz & Co., P.C. v. Kosco*, 420 Mich. 394, 402, 362 N.W.2d 676, 680 (1984) (footnotes omitted).

Whirlpool has overstated the importance of the confidential information it disseminated to Burns.  As noted above, most of the evidence presented as "confidential" was information that was generally known in the trade or readily ascertainable.  Moreover, no evidence was presented that would suggest that the information obtained by Burns, even if confidential, would be useful to him in his retail sales position for Electrolux in Virginia or West Virginia.  Accordingly, the Court finds that Whirlpool has little likelihood of success

10

on the merits of its claim that Burns' employment with Electrolux would violate ¶ 6(c) of the Leadership Agreement.

Paragraph 6(b) of the Leadership Agreement prohibits Burns from competing with Whirlpool "with respect to any product or service for which Timothy A. Burns had responsibility during the last five years of employment with the Company." Burns' employment with Electrolux would clearly violate ¶ 6(b). Nevertheless, this does not end the Court's inquiry. The Court must still determine whether such a prohibition would be reasonable.

The non-compete provision is for a one year period. Courts have upheld non-compete agreements covering time periods of six months to three years. *Lowry Computer Products, Inc. v. Head*, 984 F. Supp. 1111, 1116 (E.D. Mich. 1997). The Court has no reason to believe that the one year duration for the non-compete agreement is unreasonable.

The non-compete provision has no geographical limitation. In *Lowry* the Court held that an unlimited geographical scope may be reasonable if the plaintiff's business is sufficiently national and international in scope. *Id.* (citing *Superior Consulting Co., Inc. v. Walling*, 851 F. Supp. 839, 847 (E.D. Mich. 1994)). Whirlpool is national and international in scope. Nevertheless, "[g]eographic limitations in non-competition agreements must be tailored so that the scope of the agreement is no greater than is reasonably necessary to protect the employer's legitimate business interests." *Superior Consulting*, 851 F. Supp. at 847. Because ¶ 6(b) contains no geographical limitation, it would essentially bar Burns

11

from selling home appliances anywhere in the world for a one year period, even if such sales did not involve any of the same customers he served during his tenure at Whirlpool or the use of confidential information obtained from Whirlpool.

The Court finds that Whirlpool's standard non-compete provision, as applied to Burns, extends far beyond Whirlpool's "reasonable competitive business interests."  Whirlpool has not shown a likelihood of success on its claim that ¶ 6(b) is enforceable as to Burns.

Because there is no evidence that Burns has disclosed or is likely to disclose any information subject to the confidentiality provision in ¶ 1, and because there is no evidence that Burns has any confidential information that would help him perform his job duties at Electrolux, Whirlpool has not shown that it faces a real threat of irreparable harm if it is not granted a preliminary injunction.  On the other hand, a preliminary injunction would cause substantial harm to Burns.  He would be without employment.  Although Burns could conceivably find employment using his sales expertise in another field, denying him the ability to use the general knowledge of home appliances that he has gained in the past four years would cause him substantial economic hardship.

"It is the public policy of Michigan as embodied by statute to enforce reasonable non-competition provisions in employment contracts."  *Leach v. Ford Motor Co.*, 299 F. Supp. 2d 763, 776 (E.D. Mich. 2004) (citing M.C.L. § 445.774a(1)).  The operative word is reasonable.  If a non-compete provision is not reasonable, then the policy of freedom to contract comes into conflict with the doctrine against contractual restraints of trade.  *Ram*

12

*Products*, 967 F. Supp. at 1091.   Because this Court has found that the non-compete

provision is unreasonable as applied to Burns, public policy does not support the issuance of

a preliminary injunction.

Balancing the four preliminary injunction facts, this Court concludes that preliminary

injunctive relief is not warranted in this case.   The temporary restraining order will

accordingly be dissolved and Whirlpool's motion for preliminary injunction will be denied.

An order consistent with this opinion will be entered.


Date:   ___September 27, 2006___        /s/ Robert Holmes Bell
                                        ROBERT HOLMES BELL
                                        CHIEF UNITED STATES DISTRICT JUDGE